# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————  )
)
**UNITED STATES OF AMERICA**          )
)          **CRIMINAL ACTION**
**v.**                                )          **NO.  4:19-40046-TSH**
)
)
**JOHN ROBLES, AMAURIS ANTONIO**      )
**ROSARIO GARCIA, CINTIA FRANCO, &**  )
**JECTOR TORRES,**                    )
                    **Defendants.**   )
———————————————————————  )


## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO SUPPRESS EVIDENCE (Docket No. 78)

### June 1, 2020

**HILLMAN, D.J.,**

The United States of America (the "Government") charged John Robles, Amauris Antonio Rosario Garcia, Cintia Franco, and Jector Torres (collectively, the "Defendants") with, *inter alia*, conspiracy to distribute and possess with intent to distribute fentanyl and heroin.  The Defendants move to suppress evidence obtained from two Government wiretaps.[1]  (Docket No. 78).  Garcia and Franco further move to suppress evidence obtained pursuant to a warrant to search Garcia's apartment (the "Apartment") and a blue Prius registered to Franco (the "Prius").  (Docket No. 78).  For the following reasons, the Court ***denies*** the motion.

---

[1]    Garcia filed an individual motion to suppress on April 17, 2020.  (Docket No. 78).  Robles, Franco, and Torres subsequently moved to join his motion.  (Docket Nos. 98, 104, & 112). Because the Court ***grants*** these motions to join, it refers to Garcia's motion as a joint motion for the remainder of this opinion.

**Discussion**

*1.  Wiretaps*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522, requires that any application for a wiretap include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* at § 2518(1)(c).  "This aptly-named 'necessity' prong requires the government to have 'made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls.'" *United States v. Rose*, 802 F.3d 114, 118 (1st Cir. 2015) (quoting *United States v. Cartagena*, 593 F.3d 104, 109 (1st Cir. 2010)).

The Defendants argue that the Government has not shown the necessity for the July and August wiretaps because, at the time Special Agent DiTullio applied for these wiretaps, investigators "had already used traditional methods to accomplish what they purpo[r]tedly set out to do: identify the group responsible for distributing from, and supplying narcotics to, Albino's market." (Docket No. 82 at 16–17).  The Court acknowledges that the Government undoubtedly had achieved some success in its investigation when it applied for the wiretaps.  Partial success, however, does not eliminate the need for further evidence.[2]  *See Rose*, 802 F.3d at 119.  The necessity inquiry hinges on "whether traditional investigative procedures already have succeeded or would be likely to succeed in laying bare *the full reach* of the crimes that are under investigation." *Santana-Dones*, 920 F.3d at 77 (emphasis added).  And here, although traditional

---

[2]      Even assuming, as the Defendants argue, the Government had enough evidence to file charges against them, "[t]he inquiry into whether the government has sufficiently demonstrated necessity does not hinge on whether it already has garnered enough goods to pursue criminal prosecution." *United States v. Santana-Dones*, 920 F.3d 70, 77 (1st Cir. 2019).

investigative procedures had uncovered useful evidence, they had not laid bare the full reach of the Defendants' conspiracy.

For example, in applying for the July wiretaps, Special Agent DiTullio testified that he had been unable to (1) "fully identify all of the Target Subjects and their criminal associates or obtain sufficient evidence to prove their guilt beyond a reasonable doubt," (2) "identify or obtain evidence against many individuals who supply the Target Subjects with controlled substances" or determine the specific relationship between Robles and Garcia, or (3) "make large-scale seizures of drugs or US currency" from the conspirators or discover "how the Target Subjects dispose of the proceeds of their illegal activities."  (Docket Nos. 82-6 at 38–39).  He sought the July wiretap to fill in these gaps in the Government's knowledge and seize admissible evidence concerning the names and addresses of participants in the conspiracy; the leadership of the conspiracy; the relationships among co-conspirators; the dates, times, and places for commission of the target offenses; and the collection and distribution of proceeds.  *See United States v. Delima*, 886 F.3d 64, 70 (1st Cir. 2018)  (upholding a wiretap issued for the purposes of "(1) identify[ing] the conspiracy's leaders; (2) ascertain[ing] the names, phone numbers, and addresses of associates of the conspiracy, including drug suppliers, distributors, and customers; (3) determin[ing] the manner in which drugs were trafficked to and stored in Vermont; and (4) discover[ing] the methods used by the organization to funnel proceeds back to individual participants").  And he explained in exhaustive detail why other methods of investigation (e.g., controlled purchases, physical surveillance, GPS location data, and interviews with confidential informants) had failed to provide and could not reasonably be expected to provide the sought-after information.  Given the circumstances, the Court determines that Special Agent DiTullio established the necessity of the July wiretap.

As to the August wiretap application, Special Agent DiTullio testified that, even accounting for the intercepted conversations in July, he still needed more information to (1) prove guilt beyond a reasonable doubt against some conspirators, (2) determine the nature of the relationship between Garcia and his source of narcotics from New York, or (3) make large-scale seizures of drugs or discover how the conspirators disposed of the proceeds of their illegal activities.  Special Agent DiTullio sought to the August wiretap to fill in these gaps in the Government's knowledge and continue to seize admissible evidence related to the goals discussed above.  Because he adequately explained why other methods of investigation had failed to provide or could not reasonably be expected to provide this information, the Court determines that Special Agent DiTullio demonstrated the necessity for the August wiretap.  The Court accordingly ***denies*** the motion to suppress the fruits of the July or August wiretaps.

## 2.  *Search of the Apartment and the Prius*

"A search warrant application must demonstrate probable cause to believe that: 1) a crime has been committed, and 2) enumerated evidence of the offense will be found at the place to be searched—the so-called nexus element." *United States v. Hicks*, 575 F.3d 130, 136 (1st Cir. 2009) (citations and internal quotation marks omitted).  "Probable cause exists when 'the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it.'" *See United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996) (quoting *United States v. Aguirre*, 839 F.2d 854, 857–58 (1st Cir. 1988))).

Garcia and Franco argue that the affidavit Special Agent DiTullio submitted in support of the application for a search warrant fails to establish probable cause to believe that the Apartment

or the Prius would contain evidence of the charged conspiracy.[3]   The Court disagrees.   The affidavit details several controlled buys which the chain of events suggests that Garcia and Franco stored narcotics in the Apartment.[4]   *See United States v. Gonzalez-Arias*, 946 F.3d 17, 24 (1st Cir. 2019) (noting that a magistrate judge "may find probable cause to believe that criminal objects are in a suspect's residence" in the absence of direct evidence if, in interpreting the affidavit in a common-sense manner, she "glean[s] the link from circumstantial evidence" (citations and internal quotation marks omitted)).   For example, on June 27, 2019, a cooperating witness ("CW-1") informed Robles that he would stop by Albino's Market to pick up 200 purported oxycodone pills that day.   When CW-1 arrived, he gave Robles money, and Robles "stated that he was waiting for someone to arrive with the pills."   (Docket No. 82-5 at 14).   Agents followed Garcia and Franco as they drove in a red Jeep from the Apartment to Albino's Market.   CW-1, who had been waiting outside, observed a man exit a red Jeep around the time agents reported that Garcia and Franco had arrived at Albino's Market.   The man entered the store and later returned to the red Jeep

---

[3]     The Government does not appear to dispute that Garcia and Franco, a couple who shared the Apartment and jointly used the Prius, have standing to challenge the search of either location.

[4]     The Court rejects the argument that the evidence offered by the Government to establish probable cause is stale.   In assessing staleness, courts consider factors such as "the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information."   *United States v. Tiem Trinh*, 665 F.3d 1, 13 (1st Cir. 2011).   In this case, Garcia and Franco were participating in an ongoing conspiracy to distribute controlled substances, and evidence of their past behavior was relevant to demonstrate the scope and operation of the conspiracy.   *See id.* at 14 ("We have repeatedly recognized that drug operations, when sheltered in the darkness of relative obscurity, often germinate over a protracted period of time; thus, information that might otherwise appear stale may remain fresh and timely during the course of the operation's progression").   And even assuming that Garcia had experienced "supply chain and quality control problems" in September, as the couple alleges, and that neither location would contain narcotics themselves, there was still reason to believe that the Apartment and the Prius would contain other evidence related to the conspiracy, e.g., phone numbers, proceeds, records of sales, or packaging materials.   *See United States v. Rivera*, 825 F.3d 59, 65 (1st Cir. 2016); *see also Ribeiro*, 397 F.3d at 49 ("[I]t was also reasonable to infer that a regular drug trafficker like Ribeiro kept records of his deals at his home, even if the affidavit did not show him to be a large-scale, long-time dealer as in *Feliz*.").

carrying some juice.  Immediately after the man left the store, Robles called CW-1 back into the store and handed over 200 fentanyl pills disguised as oxycodone pills.  Garcia's arrival at the store from the Apartment, in other words, coincided with the arrival of the pills for which Robles had allegedly been waiting.  The Government conducted another controlled buy in August, to similar effect.

Moreover, several conversations intercepted from the Title III wiretaps indicated that Garcia and Franco stored drugs in the Apartment.  *See Gonzalez-Arias*, 946 F.3d at 24.  For example, on August 5 and August 20, individuals cadlled Garcia and Franco to purchase narcotics. Garcia and Franco arranged to meet with these individuals at specified locations, and Garcia drove directly from the Apartment to these locations.  He did not enter Albino's Market before supplying the requested narcotics.[5]  As the First Circuit has observed, "when a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home, particularly when the defendant is observed leaving the home immediately prior to selling drugs."  *See United States v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007).  Because the affidavit contains ample evidence that Garcia and Franco had, on several occasions, left the Apartment immediately prior to supplying drugs to others, the Court determines that the affidavit demonstrates "probable cause to think that police would find in [their] apartment the incriminating evidence listed in the affidavit."  *See United States v. Ribeiro*, 397 F.3d 43, 52 (1st Cir. 2005).

The affidavit also indicates that Garcia and Franco used the Prius to facilitate the distribution of drugs.[6]  For example, during the controlled buy in August, Garcia drove the Prius

---

[5]     On August 20, Garcia and the buyer met in the parking lot of Albino's Market, but neither individual entered the store itself.

[6]     There is also evidence that Garcia and Franco used a red Jeep to facilitate the distribution of narcotics.  But the fact that they used more than one vehicle to transport narcotics does not undermine the existence of probable cause as to any individual vehicle.

to Albino's Market.  Shortly after his arrival, Robles was able to supply the 200 pills he had allegedly been waiting for.  Several days later, Garcia drove the Prius to a meeting with a buyer seeking to purchase two bags of heroin.  When officers subsequently stopped the buyer, she had a hypodermic needle and two plastic baggies of heroin in her possession.  And on August 7, agents observed Garcia drive the Prius to Torres's apartment after Torres requested to check the quality of pills offered by Garcia.  (Docket No. 82-5 at 22–23).  Given these circumstances, the Court cannot say that the affidavit fails to establish probable cause to believe that the Prius would contain evidence of the charged conspiracy.[7]

In any event, even if the affidavit failed to establish probable cause, the Court would still decline to suppress the evidence obtained from the search warrants under *United States v. Leon*, 468 U.S. 897 (1984).  *Leon* provides that suppression of evidence obtained pursuant to a warrant is only appropriate if "the magistrate abandoned his detached and neutral role," "officers were dishonest or reckless in preparing their affidavit," or officers "could not have harbored an objectively reasonable belief in the existence of probable cause."  *Id.* at 926.  Here, Garcia and Franco do not suggest that the magistrate judge abandoned his role in reviewing the application or that Special Agent DiTullio acted in a "dishonest or reckless in preparing" his affidavit.  *See id.* Instead, they argue only that "a reasonably well-trained officer would have known that the affidavit failed to establish probable cause as to the essential elements of nexus and timeliness."  (Docket No. 82 at 12).  The Court rejects this argument.  As explained in detail above, a reasonable mind

---

[7]     The Court acknowledges that the Government did not discover any drugs in the Prius during a routine traffic stop on September 19.  Drugs themselves, however, are not the only evidence relevant to the charged conspiracy, and the affidavit provides a plausible basis to believe that a search of the Prius would turn up other evidence of trafficking, such as records, cellphones, or currency.  *See Schaefer*, 87 F.3d at 565.  Thus, the September 19 search does not undermine the existence of probable cause.

could conclude that Special Agent DiTullio's affidavit in support of a search warrant suffices to establish probable cause.  His affidavit, after all, was not "a 'bare bones' affidavit" but instead "related the results of an extensive investigation."  *See Leon*, 468 U.S. at 926.  It thus was objectively reasonable under these circumstances to believe in the existence of probable cause. And because it was objectively reasonable to harbor this belief, the good faith exception applies. The Court accordingly ***denies*** the motion to suppress the fruits of the search of the Prius or the Apartment.

### Conclusion

For the reasons stated above, the Court ***denies*** the Defendants' motion to suppress. (Docket No. 78).

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**